**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
(*Electronically Filed*)**

=============================================X

DEAN A. POYNTER and LOIS M.
POYNTER, individually, and as the
representatives of a class of similarly-
situated persons,

CIVIL ACTION NO.:
3:13-CV-00773-JGH

Plaintiff(s),

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

-against-

OCWEN LOAN SERVICING LLC.,
OCWEN FINANCIAL CORPORATION,
OCWEN MORTGAGE SERVICING,
INC., and WELLS FARGO BANK,
N.A. AS TRUSTEE FOR THE
POOLING AND SERVICING
AGREEMENT DATED AS OF
SEPTEMBER 1, 2004 PARK PLACE
SECURITIES, INC. ASSET-BACKED
PASS-THROUGH CERTIFICATES
SERIES 2004-WHQ1,

Defendant(s),

=============================================X

### FIRST AMENDED CLASS ACTION COMPLAINT

**AND NOW COMES** the Plaintiffs, DEAN A. POYNTER and LOIS M. POYNTER (hereinafter the "Poynters"), individually and as the representatives of a class of similarly-situated persons, by and through counsel, that as and for their Federal Rules of Civil Procedure (hereinafter "FRCP") Rules 15, 17, 20, 21 and 23 FIRST AMENDED CLASS ACTION COMPLAINT (hereinafter the Poynters' "Complaint"), and, except for information based on their own personal knowledge, allege on information and belief based on the investigation conducted by the undersigned counsel, and facts that are a matter of public record, as follows:

## I. NATURE OF THE ACTION

1.      This is a complex matter involving an action brought by the Poynters, as individual consumers, and also as representatives of a proposed nationwide class that contains two proposed sub-classes (hereinafter the "Class" or "Classes"), as more fully defined below. One of the sub-classes consists of the Poynters, as class representatives, and those individuals similarly situated to them, for violations of Federal Law, *to wit*: the Fair Debt Collection Practices Act, 15 U.S.C. § 1601 *et seq*. (hereinafter the "FDCPA") against OCWEN LOAN SERVICING, LLC (hereinafter "OCWEN", or "Ocwen Loan Servicing, LLC"), OCWEN FINANCIAL CORPORATION (hereinafter "Ocwen Financial"), OCWEN MORTGAGE SERVICING, INC. (hereinafter "Ocwen Mortgage"), and WELLS FARGO BANK, N.A. AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF SEPTEMBER 1, 2004 PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2004-WHQ1 (hereinafter "Wells Fargo", and collectively, the "Defendants") for actual damages, statutory damages, punitive and/or exemplary damages, costs, and attorney fees (hereinafter the "Federal sub-class");

2.      The second sub-class consists of the Poynters, as class representatives, and those individuals similarly situated to them in an action arising pursuant to the Kentucky Consumer Protection Act, Kentucky Revised Statutes (hereinafter "KRS") Chapter 367, against the Defendants, for actual damages, statutory damages, punitive and/or exemplary damages, costs, and attorney fees (hereinafter the "Kentucky sub-class");

3.      The class litigation device of Federal Rules of Civil Procedure Rule 23 is particularly appropriate in the instant controversy, because the Poynters, and certain as yet unidentified similarly situated class members, are members of both sub-classes. Of course, some class

members will be members of one sub-class but not the other, but judicial economy and due process demand that the individual class members' claims are vindicated in this collective fashion;

4.      In addition to their class claims, the Poynters' Complaint sounds, individually, in Kentucky common law under various theories, specifically: breach of contract, unjust enrichment, fraud, defamation, intentional infliction of emotional distress, invasion of privacy and the violation of various other provisions of the Kentucky Consumer Protection Act, KRS 367;

5.      The Poynters' Complaint also sounds, individually, in various provisions of Federal Law, *to wit*: the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and its implementing regulations, 12 CFR § 226, *et seq.* (hereinafter "TILA"), section 6 of the Real Estate Settlement Practices Act, 12 U.S.C. § 2605 (hereinafter "RESPA") and the FDCPA all against the Defendants for actual damages, statutory damages, punitive and/or exemplary damages, costs, and attorney fees;

6.      The Poynters' are amending their Complaint due to a discovery response received by OCWEN evidencing a standardized pattern and practice of illegality. It is certainly possible that some or all of the Poynters' individual claims will likewise be amended to become class claims if additional sub-classes are identified during further discovery; if that comes to pass, the Poynters will make the appropriate motion pursuant to FRCP 15 and 23;

## II. PROCEDURAL ANTECEDENTS

7.      The legal and factual allegations contained in Complaint Paragraph(s) One (1) through Six (6) are repeated and re-alleged as if fully set forth herein;

8.      On or about July 1, 2013, the Poynters filed a Complaint styled *Dean and Lois Poynter v. Ocwen Loan Servicing, LLC* bearing Case No. 13-CI-003289 (hereinafter the Poynters' "Original

Complaint"), in the Circuit Court for the Thirtieth Judicial Circuit of Jefferson County, Kentucky;

9.      On or about July 29, 2013 Defendant OCWEN filed an Answer to the Poynters' Original Complaint, and stated as an affirmative defense that Wells Fargo was the "real party in interest" to the action. (Def. Ocwen's Ans. ¶ 13);

10.     On or about August 6, 2013, Defendant Ocwen filed a Notice of Removal, in order to remove this case to the United States District Court, Western District of Kentucky, Louisville Division. This case was thereby removed;

11.     The Poynters served PLAINTIFFS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS (hereinafter the "Poynters' First Discovery Request") on Defendant OCWEN;

12.     On or about July 3, 2014, Defendant OCWEN responded to the Poynters' First Discovery Request with, *inter alia*, documentary evidence that predicated the instant Complaint;

13.     On or about September 17, 2014, an Agreed Litigation Plan and Discovery Schedule was adopted by this Court for the instant case, wherein a deadline for Joinder of Additional Parties and Amendment of Pleadings was set at October 30, 2014. The time for joinder and amendment has not expired;

## III. JURISDICTION, PARTIES AND VENUE

14.     The legal and factual allegations contained in Complaint Paragraph(s) One (1) through Thirteen (13) are repeated and re-alleged as if fully set forth herein;

15.     Original subject matter jurisdiction of this Court exists over the Federal sub-class by virtue of Federal question jurisdiction pursuant to 28 U.S.C. § 1331;

16.     For the Kentucky sub-class, this Court has subject matter jurisdiction by way of supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims asserted by the Poynters pursuant to Federal law that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the action brought by the Poynters under Federal law herein;

17.     For the Poynters' individual claims, this Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367, respectively;

18.     This Court has in personam jurisdiction over the Defendants in a manner consonant with due process pursuant to, *inter alia*, Kentucky Revised Statutes Chapter 454, § 210 because the Defendants transact business within the Commonwealth, and/or contract to provide services within the Commonwealth and/or caused tortious injury within the Commonwealth by act or omission either within or without the Commonwealth;

19.     For the purposes of clarity, the Poynters are asserting claims on behalf of those similarly situated sub-class members who do not appear herein as named Plaintiffs;

20.     The Poynters are natural persons who are members of the consumer public and who reside at 6243 Middlerose Circle, Louisville, Kentucky 40272. The Poynters are consumers, and/or borrowers within the meaning(s) of the FDCPA, the TILA and Section 6 of the RESPA;

21.     Defendant Ocwen Loan Servicing, LLC is a corporation with its principal place of business located at 1661 Worthington Road, # 100, West Palm Beach, Florida 33409. OCWEN is a loan servicer which services thousands of loans within the Commonwealth of Kentucky and elsewhere in the country and currently services the Poynters' note and mortgage;

22.     Defendant Ocwen Financial is a publicly traded Florida corporation headquartered in Atlanta, Georgia, that provides residential mortgage servicing services. It engages in a variety of

businesses related to residential mortgage servicing, and focuses on loan servicing, specialty servicing and mortgage services. Ocwen Financial transacts or has transacted business in this district and throughout the United States. Ocwen Financial was named along with OCWEN as a defendant in a lawsuit filed by the Consumer Financial Protection Bureau and Forty-Nine (49) sovereign States of the United States of America on December 19, 2013 in the United States District Court for the District of Columbia, case number: 13-cv-2025 (RMC).

23.    In 2010, Ocwen Financial acquired and became the successor in interest to HomeEq Servicing, a servicer of residential mortgages consisting of 134,000 mostly nonprime and distressed assets totaling $22.4 billion in unpaid principal balances (hereinafter "UPB"). Ocwen Financial is a successor corporation to HomeEq and services all of the mortgages that it acquired from HomeEq Servicing, including the Poynters' mortgage through its subsidiary and/or agent Ocwen Loan Servicing, LLC. Accordingly, Ocwen Financial is joined as a Defendant herein;

24.    Defendant Ocwen Mortgage was specifically named in Defendant OCWEN's FRCP 7.1 Disclosure Statement as the Parent company of Ocwen Loan Servicing, LLC, and is accordingly joined as a Defendant herein;

25.    Defendant Wells Fargo was named as "the real party in interest" in Defendant OCWEN's Answer to the Poynters' Original Complaint; accordingly Wells Fargo is joined as a Defendant herein. (Def. Ocwen's Ans. ¶ 13);

26.    Venue is proper in this District under 28 U.S.C. § 1441(a) because this Court is the "district court of the United States for the district and division embracing the place where" the case was removed from. Ibid. See also 28 U.S.C. § 97(b);

## IV. GENERAL FACTUAL ALLEGATIONS

### A. General allegations regarding the Poynters

27.     The legal and factual allegations contained in Complaint Paragraph(s) One (1) through Twenty-Six (26) are repeated and re-alleged as if fully set forth herein;

28.     The Poynters purchased their home located in Jefferson County, Kentucky as their primary residence. The purchase of their home was financed by a first mortgage, the servicing of which is the subject of the instant litigation;

29.     The Poynters have resided in their home for more than 25 years;

30.     Dean Poynter is a disabled World War II veteran;

31.     Effective August 31, 2010, Ocwen Loan Servicing LLC assumed the servicing rights to the Poynters' mortgage and note from HomEq Servicing;

32.     OCWEN has provided a payment history of the loan beginning with September 2004;

33.     The payment history shows that OCWEN began servicing the Poynters' loan after the lender, and/or its agent and/or the prior servicer HomEq Servicing had determined that the Poynters' loan was in default;

34.     OCWEN has treated the Poynters as if they were in default from the beginning of its relationship with the Poynters;

35.     In 2011, the Poynters entered into a settlement agreement with Defendants, arising out of Civil Action No. 08-CI-07294 (hereinafter the "Modification Agreement");

36.     At all times thereafter, the Poynters have made arrangements to make each payment on time and in full;

37.     Since said settlement and dismissal of the original cause of action, all mortgage payments have been made by the escrow account of Teddy B. Gordon;

38.     Said payments have been accepted and executed by OCWEN, but OCWEN has repeatedly communicated with the Poynters stating that their payments have not been made, and/or were late;

39.     The Defendants have violated the terms and conditions of the Modification Agreement by subjecting the Poynters to the same abusive and improper practices that the Poynters had endured which culminated in the original cause of action that was settled entitling them to costs and attorney fees for the breach of said agreement by the Defendants;

40.     Upon information and belief, as in the original Complaint, the Poynters have reason to believe that they have been assessed exorbitant fees for homeowners insurance that at all times have been provided to, but nonetheless misapplied by OCWEN;

41.     At all times herein, the undersigned has represented the Poynters, but OCWEN intentionally and willfully has continued to communicate directly with the Poynters on hundreds of occasions. Due to the age and health of the Poynters, OCWEN has harassed them and worried them to the point that their medical and mental conditions have worsened;

42.     OCWEN has further called the Poynters at all hours of the day and night invading the privacy of the Poynters;

43.     OCWEN has overcharged the Poynters with inapplicable fees, and/or fees assessed without proper notice to the Poynters, and to date, has failed to provide a full accounting of all payments and charges to the Poynters in further violation of the law;

44.     As the servicer of a loan determined to be in default prior to the assumption of the rights to service the loan, OCWEN is a third party debt collector under the FDCPA;

45.     OCWEN is subject to the statutory requirements of the FDCPA;

46.     OCWEN assessed and attempted to collect from the Poynters fees and charges not owed under the terms of the Note, and/or Mortgage and/or Modification Agreement;

47.     OCWEN failed to apply payments made by the Poynters in accordance with the terms of the Note, and/or Mortgage and/or Modification Agreement;

48.     By improperly accounting for the Poynters' payments, OCWEN claims to be owed excessive fees and charges;

49.     OCWEN misled the Poynters by indicating that they were in default when they were not;

50.     OCWEN's correspondence with the Poynters was unfair and deceptive and attempted to change the terms of the agreement with the Poynters with no benefit to the Poynters;

51.     The Poynters, by and through their counsel, have written no less than four (4) Qualified Written Requests to OCWEN requesting that OCWEN correct the errors;

52.     OCWEN has failed to acknowledge three (3) of the Qualified Written Requests within five (5) business days;

53.     OCWEN has failed to correct the accounting errors identified in at least one (1) Qualified Written Request;

54.     OCWEN has failed to supply the information requested in the Qualified Written Requests;

55.     OCWEN is publishing the negative false information about the Poynters regarding the note and mortgage;

56.     The Poynters have sent OCWEN statements evidencing payments to OCWEN which OCWEN claims were not paid;

57.     The Poynters have been seriously damaged as a direct and proximate result of the Defendants actions including but not limited to a decrease in their credit score resulting in severe anxiety, loss of sleep, stress and the loss of access to credit;

## B. General allegations regarding the Defendants

58.     The legal and factual allegations contained in Complaint Paragraph(s) One (1) through Fifty-Seven (57) are repeated and re-alleged as if fully set forth herein;

59.     As of December 31, 2013, Ocwen Financial's loan servicing portfolio consisted of 2,861,918 loans with an aggregate UPB of $464.7 billion;

60.     Ocwen Financial believes that servicing and subservicing opportunities with an aggregate UPB in the range of $1.0 trillion could come to market by the end of 2016;

61.     As of September 30, 2013, OCWEN serviced 20,868 loans in the Commonwealth of Kentucky with an aggregate volume of $2,104,211,694.21;

62.     OCWEN, Ocwen Financial and Ocwen Mortgage specialize in default servicing where borrowers are more likely to encounter hardships or difficulties making payments. OCWEN, Ocwen Financial and Ocwen Mortgage also frequently acquire mortgage servicing rights through transfers, involving the acquisition of data, information, and documents retained by the prior servicer about borrowers' loans;

63.     In September 2013, Morningstar Credit Ratings, LLC assigned OCWEN rankings in only two categories: as a residential non-prime mortgage servicer (delinquent loans) and as a residential special servicer (delinquent or non-performing loans);

64.     OCWEN personnel frequently interact with borrowers who are delinquent or are at risk of becoming delinquent on their mortgage loans, who have complaints or inquiries about their

mortgages, or who require loss mitigation assistance. OCWEN personnel also frequently handle inquiries from borrowers whose loans have been transferred to OCWEN from another servicer;

65.    OCWEN personnel also frequently interact with borrowers who are represented by attorneys due to the fact that they are delinquent or are at risk of becoming delinquent on their mortgage loans, and handle *inter alia*, Qualified Written Requests from counsel for borrowers whose loans have been transferred to OCWEN from another servicer;

66.    OCWEN has comprehensive loan servicing policies and procedures in place that are available to all employees on the company's intranet site, which serves to promote consistent application of servicing practices across the enterprise;

67.    Policy and procedure guides are comprehensive, providing an effective mix of narrative overview, as well as step-by-step instruction supplemented by screenshots making them an effective reference and training tool;

68.    OCWEN employs a pervasive Quality Assurance program that provides enterprise wide review and testing to ensure compliance with its policies and procedures;

69.    The performance of the agents of OCWEN is closely monitored and critiqued in a number of areas, and a minimum score of 90% is mandatory;

70.    Low performance scores are immediately reported to management and remedial actions are closely monitored by Quality Assurance professionals;

71.    All conditions precedent necessary for the filing of this Complaint have been satisfied and/or such conditions have been waived by the conduct of the Defendants;

## V. CLASS ACTION ALLEGATIONS

72.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through Seventy-One (71) are repeated and re-alleged as if fully set forth herein;

73.     The Poynters bring this suit as a class action on behalf of themselves, and on behalf of a Nationwide Class that contains two sub-classes of similarly situated persons, *to wit*, the Federal sub-class and the Kentucky sub-class, pursuant to FRCP 23(a), and/or 23(b)(1), and/or 23(b)(2) and/or 23(b)(3). Subject to additional information obtained through further investigation and/or discovery, the foregoing definition of the Classes may be expanded or narrowed. The proposed Classes are as follows:

> **Nationwide Class:** All persons who, like the Poynters, are simultaneously members of both the Federal sub-class and the Kentucky sub-class;

> **Federal sub-class:** All persons who, like the Poynters, were contacted directly by and/or were required to provide authorization to communicate directly with their attorney(s) to the Defendant Ocwen Loan Servicing, LLC, a debt collector as defined by the FDCPA, repeatedly, despite the fact that OCWEN knew that the consumer was represented by an attorney(s) with regard to the subject debt and further OCWEN had knowledge of, or could readily ascertain, such attorney's name and address, and the attorney(s) did not fail to respond within a reasonable period of time to the communication from OCWEN per its stated policy, within the applicable statutory limitations period, including the period following the filing date of this action;

> **Kentucky sub-class:** All persons who, like the Poynters, were indebted under a High-cost home loan as defined by KRS 360.100, but nonetheless were charged late payment fees in excess of five percent (5%) of the amount of the payment past due or ten dollars ($10), whichever is greater, by the Defendant Ocwen Loan Servicing, LLC, per its stated policy, within the applicable statutory limitations period, including the period following the filing date of this action;

74.     Excluded from the Classes are: (1) Defendants, Defendants' subsidiaries, affiliates, officers, directors, assigns and successors, and any entity which Defendants have a controlling interest; and (2) the Hon. Senior District Judge John G. Heyburn II and any member of his immediate family. The Poynters expressly reserve the right to modify the Class and sub-class definitions as further investigation and/or discovery so warrant;

75.     This action has been brought and may properly be maintained as a class action pursuant to FRCP 23 and case law thereunder;

-12-

76.     **Numerosity:** The members of the Classes are so numerous that joinder of all members is impracticable. The Poynters reasonably believe that the Classes are comprised of thousands of homeowners throughout the United States and the Commonwealth of Kentucky;

77.     **Commonality:** Common questions of law and fact exist as to all members of the Classes. These common questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, but are not limited to, the following:

- whether or not OCWEN's systematic policy of requiring debtors to fill out additional paperwork before it would cease repeatedly contacting debtors directly and direct its correspondence to their attorney(s) violated the clear prohibition on communicating with debtors directly when a debt collector knows that a debtor is represented by an attorney mandated by the FDCPA;

- whether or not OCWEN's systematic policy of charging a late fee of six percent (6%) to mortgagors of High-cost home loans within the Commonwealth of Kentucky as defined by, and prohibited by KRS 360.100 was usurious;

- whether or not the Poynters and other Class members have sustained monetary loss, and the proper measure of that loss;

- whether or not the Poynters and other Class members are entitled to punitive and/or exemplary damages; and

- whether or not the Poynters and other Class members are entitled to declaratory and injunctive relief.

These and other questions of law and/or fact are common to members of the respective Classes and predominate over any questions affecting only individual members of the Class;

78.     **Typicality:** The Poynters' claims are typical of the claims of the members of the Classes, as all Class members are similarly affected by the Defendants' wrongful conduct. The Poynters, like other members of the respective Classes, were repeatedly and incessantly contacted directly by OCWEN when OCWEN knew that they were represented by an attorney; the Poynters were

also charged late fees at a rate of six (6%) percent despite the fact that they were the mortgagors of a High-cost home loan. The Poynters are advancing the same claims and legal theories on behalf of themselves and all absent members of the Classes;

79.     **Adequacy:** The Poynters' claims are made in a representative capacity on behalf of the other members of the respective Classes. The Poynters' have no interests antagonistic to the interests of the other members of the proposed Classes and are subject to no unique defenses;

80.     The Poynters are similarly situated in interest to all members of the proposed Classes and are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions. Accordingly, the Poynters are adequate representatives of the proposed Classes and will fairly and adequately protect the interests of the Classes;

81.     This suit may be maintained as a class action under FRCP 23(b)(1) because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. If the Defendants have violated the FDCPA and/or KRS 367 as to any individual Class member, then the Defendants have committed a violation against all Class members and should be enjoined from doing so in the future;

82.     This suit may be maintained as a class action under FRCP 23(b)(2) because Defendants have acted, and/or have refused to act, on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief. Specifically, injunctive relief is necessary and appropriate to require Defendants to: (i) cease and desist contacting debtors directly and/or requiring debtors to authorize OCWEN to communicate directly with their attorney(s) when

OCWEN knows that the debtor was represented by an attorney(s) with regard to the subject debt and had knowledge of, or could readily ascertain, such attorney's name and address, and the attorney(s) did not fail to respond within a reasonable period of time to any communication from OCWEN; and (ii) cease and desist charging late payment fees in excess of five percent (5%) of the amount of the payment past due or ten dollars ($10), whichever is greater, to those home owners indebted under a High-cost home loan as defined by KRS 360.100;

83.     In addition, this suit may be maintained as a class action under FRCP 23(b)(3) because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. The injury suffered by each individual class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them. Even if the members of the Classes could afford such litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents no management difficulties, and provides the benefits of single adjudication, economy of scale and comprehensive supervision by a single court;

## VI. CAUSE(S) OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### VIOLATIONS OF THE FDCPA
**(Asserted on behalf of the Poynters and the Federal sub-class)**

84.     The legal and factual allegations contained in Complaint Paragraph(s) One (1) through Eighty-Three (83) are repeated and re-alleged as if fully set forth herein;

85.    The Poynters, like all other members of the Federal sub-class, are consumers as defined by the FDCPA, natural person(s) obligated and/or allegedly obligated to pay a debt arising out of transactions that were primarily for personal, family and/or household purposes;

86.    At the time OCWEN took the assignment of the right to service the Poynters' note and mortgage, and all other members of the Federal sub-class's notes and mortgages, OCWEN treated the loans as if they were in default, and/or the loans were in default. On the bottom of the form Notice of Service Transfer attendant to OCWEN assuming the servicing rights to the Poynters' note and mortgage is the following small print: "Ocwen is a debt collector attempting to collect a debt and any information obtained will be used for that purpose. If this account is subject to a pending bankruptcy proceeding or if you have received a bankruptcy discharge for this account, this communication is for informational purposes only and is not an attempt to collect a debt." Notice of Service Transfer, annexed hereto as Exhibit A;

87.    OCWEN is a third party debt collector as defined by the FDCPA;

88.    When OCWEN began servicing debt obligations that it thought were in default and/or were in default, OCWEN took the servicing rights subject to the FDCPA;

89.    OCWEN is not protected as a servicer of the loans pursuant to the exception contained in FDCPA § 1692a (6)(F)(iii), because the loans were in default and/or were treated as if they were in default at the time the contract to begin servicing began;

90.    On April 17, 2012, January 10, 2013, January 17, 2013 and February 5, 2013, the Poynters' attorney, Teddy B. Gordon, sent correspondence to OCWEN that, *inter alia*, advised it that the Poynters were represented by him (just like during the negotiation of the Modification Agreement), and to direct all future correspondence to him, and not the Poynters directly (hereinafter the "QWRs" which are annexed hereto as Exhibit B);

91.     On March 15, 2013, OCWEN responded directly to the Poynters in response to the QWRs with the following verbatim statement: "Concern: We are in the receipt a correspondence from Teddy B. Gordon (Attorney at Law), who expressed concern regarding the late charges and lender placed insurance assessed on the above loan. We were requested to respond to the quires outlined in the correspondence. Response: Our records indicate that Teddy B. Gordon (Attorney at Law) is not authorized to receive any information on the above-referenced loan number. ***Please note that in order for us to authorize Teddy B. Gordon (Attorney at Law), it is requested that you provide us with a written authorization.*** You may forward the requested information to…" (hereinafter OCWEN's "Response" which is annexed hereto as Exhibit C (my emphasis)). The authorization form that OCWEN requires the mortgagors of the mortgages that it services to complete before it will communicate directly with their attorneys is available online at: https://ocwen.mortgagebanksite.com/pdfs/third-party-auth.pdf, and is annexed hereto as Exhibit D;

92.     OCWEN violated the FDCPA § 1692b (6) as to the Poynters and all other members of the Federal sub-class by continuing to communicate with them directly after OCWEN had actual knowledge that they were represented by an attorney(s) with regard to the subject debt and had knowledge of, or could readily ascertain, such attorney's name and address, despite the fact that the attorney(s) did not fail to respond within a reasonable period of time to the communication from OCWEN;

93.     OCWEN likewise violated the FDCPA § 1692c (a)(2) as to the Poynters and all other members of the Federal sub-class by communicating with the consumer members of the Federal sub-class directly when OCWEN had actual knowledge that they were represented by an attorney(s) with respect to the debt it was servicing and had knowledge of, or could readily

-17-

ascertain, such attorney's name and address, and the attorney(s) did not fail to respond within a reasonable period of time to any communication from OCWEN, and further the attorney(s) did not consent to direct communication with the consumer, and OCWEN did not have the prior consent of the consumer given directly to OCWEN or the express permission of a court of competent jurisdiction;

94.     OCWEN's Response constitutes a standardized policy and/or procedure that is a *per se* violation of the mandates of the FDCPA, and accordingly violates the FDCPA as to all other Federal sub-class members similarly situated to the Poynters;

95.     Upon information and belief, there are numerous other members of the Federal sub-class, who are/were represented by counsel, and are/were continuously contacted by OCWEN directly despite OCWEN having actual knowledge that they were represented by counsel;

96.     As a result of the above violations of the FDCPA, OCWEN is liable to the Poynters and the similarly situated other members of the Federal sub-class for their actual damages, statutory damages, punitive and/or exemplary damages, costs and attorney fees;

97.     OCWEN knowingly and/or negligently violated the FDCPA;

**AS AND FOR A SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT**
**(Asserted on behalf of the Poynters and the Kentucky sub-class)**

98.     The legal and factual allegations contained in Complaint Paragraph(s) One (1) through Ninety-Seven (97) are repeated and re-alleged as if fully set forth herein;

99.     The Poynters are natural persons;

100.    The Poynters' home loan was incurred for personal, and/or family and/or household purposes (the purchase of their home);

101.    The Poynters' home loan is secured by a mortgage on residential real property or secured by collateral which has a mortgage lien interest in residential real property, which is occupied by the Poynters as their principal dwelling;

102.    The Poynters' home was purchased with a loan, the principal amount of which totaled $85,659.20, as evidenced by the TRUTH-IN-LENDING DISCLOSURE STATEMENT, which is annexed hereto as Exhibit E;

103.    The total points and fees payable by the Poynters at or before the loan closing totaled $7,113.42, which exceeded the greater of three thousand dollars ($3,000) or six percent (6%) of the total loan amount as shown as the amount financed on the final TRUTH-IN-LENDING DISCLOSURE STATEMENT ($85,659.20 X 6% = $5,139.55) as evidenced by the BORROWER'S ACKNOWLEDGMENT OF FINAL LOAN TERMS, which is annexed hereto as Exhibit F;

104.    Accordingly, the Poynters' home, and the homes of the other members of the Kentucky sub-class, were purchased with High-cost home loans as defined by KRS 360.100 (1)(a);

105.    KRS 360.100 (2)(q) prohibits the charging of a late payment fee on a High-cost home loan in excess of five percent (5%) of the amount of the payment past due or ten dollars ($10), whichever is greater;

106.    OCWEN's Response contains the following verbatim statement: "Our records indicate that the loan is due on the first (1st) of every month. However, according to Ocwen's late fee policy, you have fifteen (15) days grace period to make your monthly mortgage payments without being assessed a late charge. If the monthly mortgage payment is made after this grace period, *__a late charge equal to six (6%) of the overdue payment of principal and interest will be assessed on your loan.__*" Response; Exhibit C (my emphasis);

107.     OCWEN did, in fact, charge the Poynters late fees equal to six (6%) whilst it serviced the Poynters' mortgage and note;

108.     OCWEN's Response constitutes a standardized policy and/or procedure that is a *per se* violation of the mandates of KRS 360.100, and accordingly violates KRS 360.100 as to all other Kentucky sub-class members similarly situated to the Poynters;

109.     Upon information and belief, of the 20,868 or more loans serviced by OCWEN within the Commonwealth of Kentucky, there are numerous other members of the Kentucky sub-class, who are/were indebted under a High-cost home loan, but were nonetheless charged late fees at a rate of six (6%) percent by OCWEN;

110.     OCWEN, and/or Ocwen Financial, and/or Ocwen Mortgage and/or Wells Fargo purchased or were otherwise assigned the Poynters' and the other Kentucky sub-class members' respective High-cost home loans, and are accordingly "lenders" as defined by KRS 360.100 (1)(b) subject to an action for violation of KRS 360.100 as the violation for which this Class action is brought (improper late fees assessed) is apparent on the face of the TRUTH-IN-LENDING DISCLOSURE STATEMENT, Exhibit E, and/or the underlying promissory note, which is annexed hereto as Exhibit G;

111.     KRS 360.100 (3) provides that: "the making of a high-cost home loan which violates any provisions of [KRS 360.100 (2)] is usurious, subject to the penalties of this chapter, and unlawful as an unfair and deceptive act or practice in or affecting commerce in violation of the provisions of KRS 367.170." KRS 360.100 (3) further provides that: "Any person seeking damages or penalties under the provisions of KRS 360.100 may recover damages under either this chapter or KRS Chapter 367, but not both." Accordingly, due to other violations of KRS 367 perpetrated by Defendants as to the Poynters in their individual capacity, the Poynters and those other members

-20-

of the Kentucky sub-class bring this Class action for violations of KRS 360.100 pursuant to KRS 367;

112.     As a result of the above violations of KRS 367, OCWEN, and/or Ocwen Financial, and/or Ocwen Mortgage and/or Wells Fargo are liable to the Poynters and the similarly situated other members of the Kentucky sub-class for their actual damages, statutory damages, punitive and/or exemplary damages, costs and attorney fees;

113.     OCWEN knowingly and/or negligently violated KRS 367;

**AS AND FOR A THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE RESPA**
**(Asserted on behalf of the Poynters in their individual capacity)**

114.     The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Thirteen (113) are repeated and re-alleged as if fully set forth herein;

115.     OCWEN is a "servicer" of the Poynters' note and mortgage as defined by RESPA;

116.     The Poynters are "debtor[s]" as defined by RESPA;

117.     The Poynters, by and through their attorney, wrote their FIRST Qualified Written Request to OCWEN on April 17, 2012 requesting information on their loan and requesting that OCWEN correct accounting errors made by OCWEN which resulted in OCWEN assessing fees that the Poynters did not owe. The "Qualified Written Request" as that term is defined under the RESPA, § 2605 (e)(1)(B), sought a correction of OCWEN's accounting of the Poynters' loan regarding the crediting of payments on their mortgage account and sought certain information. See the QWRs; Exhibit B;

118.     OCWEN failed to acknowledge receipt of the FIRST Qualified Written Request within five (5) business days;

119.    The Poynters, by and through counsel, wrote their SECOND Qualified Written Request to OCWEN on January 10, 2013 that, *inter alia*, requested information on their loan. The "Qualified Written Request" as that term is defined under RESPA, § 2605 (e)(1)(B), *inter alia*, sought certain information. See the QWRs; Exhibit B;

120.    OCWEN responded to the SECOND Qualified Written Request but took no corrective action;

121.    The Poynters, by and through counsel, wrote their THIRD Qualified Written Request to OCWEN on January 17, 2013 that, *inter alia*, requested information on their loan. The "Qualified Written Request" as that term is defined under RESPA, § 2605 (e)(1)(B), *inter alia*, sought certain information. See the QWRs; Exhibit B;

122.    OCWEN failed to acknowledge receipt of the THIRD Qualified Written Request within five (5) business days;

123.    OCWEN failed to address the issues raised in the THIRD Qualified Written Request within thirty (30) days and took no corrective action;

124.    The Poynters, by and through counsel, wrote their FOURTH qualified written request to OCWEN on February 5, 2013 requesting information on their loan and requesting that OCWEN correct accounting errors made by OCWEN which resulted in OCWEN assessing fees that the Poynters did not owe. The "Qualified Written Request" as that term is defined under RESPA, § 2605 (e)(1)(B), sought a correction of OCWEN's accounting of the Poynters' loan regarding the crediting of payments on their mortgage account and sought certain information. See the QWRs; Exhibit B;

125.    OCWEN failed to acknowledge receipt of the FOURTH Qualified Written Request within five (5) business days;

Case 3:13-cv-00773-DJH-CHL   Document 26   Filed 07/08/15   Page 23 of 33 PageID #: 291

126.    OCWEN responded to the FOURTH Qualified Written Request but took no corrective action;

127.    OCWEN violated RESPA, § 2605 (e)(2)(C) by failing to provide the Poynters with the information and documentation requested, or an explanation why the information sought was unavailable, and take corrective action on the request to correct their accounting of the Poynters' payments no later than thirty (30) days after receipt of the Poynters' Qualified Written Request(s);

128.    OCWEN has engaged in a pattern or practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. § 2605;

**AS AND FOR A FOURTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Asserted on behalf of the Poynters in their individual capacity)**

129.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Twenty-Eight (128) are repeated and re-alleged as if fully set forth herein;

130.    The Poynters and the Defendants entered into a contract, specifically the mortgage and note and/or the Modification Agreement;

131.    The Poynters performed as they were required to under the mortgage and note and/or the Modification Agreement;

132.    All of the conditions precedent to Defendants' performance under the mortgage and note and/or the Modification Agreement have been satisfied and/or such conditions have been waived by the conduct of the Defendants;

133.    The Defendants are in breach of contract by failing to account for the Poynters' payments in accordance with the note and mortgage and/or the Modification Agreement;

-23-

134.    The Defendants are in further breach of contract by charging the Poynters fees that they did not owe under the terms of the note and mortgage and/or the Modification Agreement;

135.    The Defendants are in further breach of contract by treating the Poynters as if they were in default notwithstanding the fact that under the terms of the note and mortgage and/or the Modification Agreement they were not;

136.    The Defendants have charged unlawful and excessive fees to the Poynters in breach of the note and mortgage and/or the Modification Agreement;

137.    The Defendants have breached covenants in the note and mortgage and/or the Modification Agreement by charging late fees not authorized in the note and mortgage and/or the Modification Agreement and by misapplying payments not in accordance with the note and mortgage and/or the Modification Agreement;

138.    The Defendants breached their duty to mitigate damages by continuing to attempt to collect additional money in the form of additional payments, fees and charges after being confronted with the original breaches;

139.    As a direct result of these acts by the Defendants, the Poynters have been damaged in an amount to be determined at trial;

**AS AND FOR A FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Asserted on behalf of the Poynters in their individual capacity)**

140.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Thirty-Nine (139) are repeated and re-alleged as if fully set forth herein;

141.    The Poynters have been made to pay the Defendants in excess of the amount owed under the terms of the note and mortgage and/or the Modification Agreement or they would have been in imminent risk of losing their home;

142.   To the extent that the Poynters have paid amounts in excess of amounts owed under the note and mortgage and/or the Modification Agreement, the trust agreement, the pooling and servicing agreement and Federal and state law, the Defendants have been unjustly enriched at the expense of the Poynters;

143.   As a direct and proximate result of the foregoing unjust enrichment, the Poynters are entitled to judgment requiring the Defendants to remit an amount to be proved at trial;

**AS AND FOR A SIXTH CAUSE OF ACTION**
**VIOLATIONS OF THE FDCPA**
**(Asserted on behalf of the Poynters in their individual capacity)**

144.   The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Forty-Three (143) are repeated and re-alleged as if fully set forth herein;

145.   The Poynters are consumers as defined by the FDCPA, natural persons allegedly obligated to pay a debt;

146.   At the time OCWEN took the assignment of the right to service the Poynters' note and mortgage, OCWEN treated the loan as if it were in default and/or it was in default;

147.   OCWEN is a third party debt collector as defined by the FDCPA;

148.   When OCWEN began servicing a debt obligation that it thought was in default, OCWEN took the servicing rights subject to the FDCPA;

149.   OCWEN is a third party debt collector attempting to collect a debt which it had determined to be already in default;

150.   OCWEN is not protected as a servicer of the loan, because the loan was treated as if it was in default at the time the contract to begin servicing began;

151.    OCWEN violated the FDCPA § 1692e through false, deceptive and misleading representations in communications to the Poynters. OCWEN's violations include but are not limited to the following:

      a.   The false representation of the character and amount of money owed under the note and mortgage;

      b.   The false representation of compensation legally allowed to be charged to the Poynters;

      c.   The false representation that the Poynters were in default, when they were not; and

      d.   The deceptive representations sent to the Poynters soliciting the Poynters to pay additional funds;

152.    OCWEN violated the FDCPA § 1692f through the unfair and unconscionable means it employed. The violations include but are not limited to:

      a.   The collection of interest, fees, charges, and other categories incidental to the principal obligation not authorized by the agreement creating the debt and not permitted by law;

153.    As a result of the above violations of the FDCPA, OCWEN is liable to the Poynters for the Poynters' actual damages, statutory damages, punitive and/or exemplary damages, costs and attorney fees;

154.    OCWEN knowingly and/or negligently violated the FDCPA;

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT**
**(Asserted on behalf of the Poynters in their individual capacity)**

155.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Fifty-Four (154) are repeated and re-alleged as if fully set forth herein;

156.    The Poynters are indebted under a High-cost home loan as defined by KRS 360.100;

157.    OCWEN is a "servicer" as defined by KRS 367.320(1): "any person or entity who currently collects or processes payments on a [High-cost home loan], regardless of whether that person or entity is the owner, the holder, the assignee, the nominee for the loan, the beneficiary of a trust, or any person acting on behalf of such person";

158.    OCWEN committed unfair, false, misleading and/or deceptive acts and/or practices in connection with the subject note and mortgage including but not limited to the following:

        a.   misapplication of the Poynters' payments;

        b.   failure to apply the Poynters' payments in accordance with the priorities outlined in the mortgage, and/or required by law;

        c.   assessment of fees and charges not owed under the note and mortgage; and

        d.   failure to correct the loan history after being notified by the Poynters of the errors;

159.    OCWEN continues to systematically violate KRS 367 by continuing the conduct alleged herein;

**AS AND FOR AN EIGHTH CAUSE OF ACTION**
**FRAUD**
**(Asserted on behalf of the Poynters in their individual capacity)**

160.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Fifty-Nine (159) are repeated and re-alleged as if fully set forth herein;

161.    OCWEN represented to the Poynters through correspondence sent directly to the Poynters that they were late in making payments;

162.    The false statements were made with knowledge of their falsity or at a minimum with complete and utter disregard and/or recklessness as to their truth or falsity;

163.    The false statements were material as the Poynters were assessed additional fees as a result of OCWEN's misrepresentations and were made to pay thousands of dollars that they did not owe;

164.    OCWEN intended to mislead the Poynters when it made the false statements to them;

165.    The Poynters justifiably relied on the statements made by OCWEN as the servicer of their loan;

166.    As a direct and proximate result of OCWEN's false representations, the Poynters suffered substantial injuries;

**AS AND FOR A NINTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Asserted on behalf of the Poynters in their individual capacity)**

167.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Sixty-Six (166) are repeated and re-alleged as if fully set forth herein;

168.    OCWEN intended to cause emotional distress or knew or should have known that their actions, in an attempt to collect finance charges not owed by the Poynters, would result in the Poynters suffering serious emotional distress;

169.    OCWEN proximately caused the Poynters psychic injuries. The Poynters suffer from severe humiliation, distress and anxiety. The loss of their financial well-being and good credit standing is the source of serious emotional distress;

170.    The mental anguish suffered by the Poynters is serious;

**AS AND FOR A TENTH CAUSE OF ACTION**
**DEFAMATION**
**(Asserted on behalf of the Poynters in their individual capacity)**

171.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Seventy (170) are repeated and re-alleged as if fully set forth herein;

172.    OCWEN made false and defamatory statements about the Poynters concerning the Poynters' note and mortgage;

173.    The false statements made by OCWEN claimed that the Poynters were in default and late on their mortgage payments when in fact they had made timely payments in full;

174.    The false statements made by OCWEN claimed that the Poynters were a credit risk when they were not;

175.    OCWEN published these false statements to the credit reporting agencies;

176.    The Poynters were injured as a direct and proximate result of the actions of OCWEN;

177.    OCWEN acted with actual malice in their continued attempts to collect a finance charge that was not owed to them;

178.    OCWEN's actions were in reckless disregard for the truth or falsity of the publication. The false statements were made by OCWEN with knowledge of their falsity and/or with reckless disregard for whether they were true or false;

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**INVASION OF PRIVACY**
**(Asserted on behalf of the Poynters in their individual capacity)**

179.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Seventy-Eight (178) are repeated and re-alleged as if fully set forth herein;

180.    OCWEN invaded the privacy of the Poynters by unreasonably intruding upon their seclusion;

181.    OCWEN invaded the privacy of the Poynters by unreasonably publicizing false information regarding the Poynters' private life;

182.    OCWEN invaded the privacy of the Poynters by unreasonably placing the Poynters in a false light before the public by furnishing the false information to the credit reporting agencies;

183.    OCWEN invaded the right to privacy of the Poynters and is subject to liability for the emotional and financial harm the Poynters suffered as a direct and proximate result of their actions;

184.    The conduct of OCWEN was intentional, willful, and/or knowing;

185.    The false statements were made by OCWEN with knowledge of their falsity and/or with reckless disregard for whether they were true or false;

**AS AND FOR A TWELFTH CAUSE OF ACTION**
**VIOLATIONS OF THE TILA**
**(Asserted on behalf of the Poynters in their individual capacity)**

186.    The legal and factual allegations contained in Complaint Paragraph(s) One (1) through One-Hundred and Eighty-Five (185) are repeated and re-alleged as if fully set forth herein;

187.    OCWEN is a "servicer" as defined by the TILA;

188.    OCWEN violated § 1639f (a) of the TILA by failing to credit payments made by the Poynters to their loan account as of the date of receipt;

189.    OCWEN's failure to credit payments in a timely manner constituted a violation of the TILA, § 1639f (a), since the Poynters were making payments on their home mortgage, the payments were thereby made in connection with a consumer credit transaction secured by the Poynters' principal dwelling, and the delay in crediting the Poynters' account did result in charges to the Poynters and/or in the reporting of negative information to consumer reporting agencies;

190.    As a result of the above violations of the TILA, OCWEN is liable to the Poynters for the Poynters' actual damages, statutory damages, punitive and/or exemplary damages, costs and attorney fees;

191.    OCWEN knowingly and/or negligently violated the TILA;

-30-

## VII. PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs, DEAN AND LOIS POYNTER, on behalf of themselves and all members of the Classes defined herein, demand judgment against the Defendants, OCWEN LOAN SERVICING, LLC, OCWEN FINANCIAL CORPORATION, OCWEN MORTGAGE SERVICING, INC. and WELLS FARGO BANK, N.A. AS TRUSTEE FOR THE POOLING AND SERVICING AGREEMENT DATED AS OF SEPTEMBER 1, 2004 PARK PLACE SECURITIES, INC. ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES 2004-WHQ1, as follows:

a) Certification of the Classes under Federal Rules of Civil Procedure Rule 23 and appointment of Plaintiffs as representatives of the Classes and their counsel as Class counsel;

b) A temporary, preliminary and/or permanent order for injunctive relief requiring Defendants to: (i) cease and desist contacting debtors directly and/or requiring debtors to authorize OCWEN to communicate directly with their attorney(s) when OCWEN knows that the debtor is represented by an attorney(s) with regard to the subject debt and has knowledge of, or can readily ascertain, such attorney's name and address, and the attorney(s) did not fail to respond within a reasonable period of time to any communication from OCWEN; and (ii) cease and desist charging late payment fees in excess of five percent (5%) of the amount of the payment past due or ten dollars ($10), whichever is greater, to those home owners indebted under a High-cost home loan as defined by KRS 360.100;

c) An order requiring imposition of a constructive trust and/or disgorgement of Defendants' ill-gotten gains and to pay restitution to Plaintiffs and all members of

the Classes and to restore to the Plaintiffs and all members of the Classes all funds

acquired by means of any act or practice declared by this Court to be unlawful;

d) Distribution of any monies recovered on behalf of members of the Classes via

fluid recovery or *cy pres* recovery where necessary and as applicable, to prevent

Defendants from retaining the benefits of their wrongful conduct;

e) Compensatory and other damages for economic and non-economic damages

identified herein, including all damages allowed by governing statutes;

f) Punitive and/or exemplary damages as permitted by law;

g) Statutory pre-judgment and post-judgment interest on any amounts;

h) Reasonable attorneys' fees as may be allowable under applicable law;

i) Costs of this suit; and

j) Such other relief as this Court may deem just and proper.

## VIII. JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.


Dated: October 30, 2014                                       Respectfully submitted,



*/s/ Peter J. Jannace*                                        */s/ (by PJJ with consent)*
PETER J. JANNACE                                              TEDDY B. GORDON
*Attorney for Plaintiffs*                                     *Attorney for Plaintiffs*
807 West Market Street                                        807 West Market Street
Louisville, KY 40202                                          Louisville, KY 40202
(646) 783-9810                                                (502) 585-3534
peter.jannace@gmail.com                                       tbearaty@aol.com

## <u>CERTIFICATE OF SERVICE</u>

   It is hereby certified that on the 30th day of October, 2014, a true and correct copy of the foregoing was electronically filed by using the CM/ECF system, which will generate copies to all counsel of record (no pro se parties). It is hereby further certified that the undersigned is unaware of any non-CM/ECF participants. Filing via CM/ECF will send a notification of electronic filing to the following: Hon. Christopher M. Hill, Christopher M. Hill & Associates, P.S.C., P.O. Box 817 Frankfort, Kentucky 40602.


               */s/ Peter J. Jannace*_____
               COUNSEL FOR PLAINTIFFS