UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

DEAN POYNTER and LOIS POYNTER,                                        Plaintiffs,

v.                                              Civil Action No. 3:13-cv-773-DJH-CHL

OCWEN LOAN SERVICING, LLC, et al.,                                   Defendants.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiffs Dean and Lois Poynter claim that Defendants Wells Fargo and Ocwen Loan Servicing violated their rights under the Fair Debt Collection Practices Act (FDCPA), the Kentucky Consumer Protection Act, and the Real Estate Settlement Procedures Act when the Poynters defaulted on their home loan. (Docket Nos. 1; 26) Wells Fargo initiated foreclosure proceedings and retained Ocwen to service the loan. (D.N. 59, PageID # 1233) The parties were able to negotiate a loan modification agreement. (*Id*.) Throughout the process, the Poynters were represented by counsel. (*Id*.) The agreement contained three provisions relevant here: (1) a jury waiver provision, (2) a provision that all communications from Ocwen were to be sent directly to the Poynters, and (3) a provision that the terms of the agreement could only be changed by written consent from both the Poynters and Ocwen. (*Id*.) After the agreement was finalized, the Poynters' counsel wrote Ocwen to request that all future correspondence be directed to him, and not the Poynters. (D.N. 26, PageID # 284) Ocwen responded by sending an authorization form to the Poynters to certify that counsel should receive future communications. (D.N. 26-3, PageID # 311) The Poynters never responded. (D.N. 59, PageID # 1234) Instead, the Poynters filed suit, claiming that Ocwen's direct communications with them violated the FDCPA. (D.N. 1; D.N. 26) The Poynters' complaint included a jury demand, which Ocwen has

1

moved to strike, citing the jury waiver provision in the loan modification agreement. (D.N. 38) Because the jury waiver provision is enforceable, the Court will grant this motion. The Poynters have also filed a motion seeking certification of a class consisting of themselves and others who were contacted by Ocwen while represented counsel. (D.N. 58) Because the Poynters have not demonstrated that they meet the requirements for class certification under Rule 23, the Court will deny this motion.

## I.     BACKGROUND

In July 2004, Dean and Lois Poynter took out a loan on their home. (*See* D.N. 26-7; D.N. 59) Wells Fargo bought the loan and currently holds the note. (D.N. 44-1, PageID # 493; D.N. 59, PageID # 1232–33) In 2008, the Poynters defaulted on the loan. (D.N. 59, PageID # 1233) Thereafter, Wells Fargo filed a foreclosure action and retained Ocwen Loan Servicing, LLC to service the loan. (*Id*.) The Poynters were represented during the foreclosure proceedings by attorney Teddy Gordon. (*Id*.) In 2011, Wells Fargo, Ocwen, and the Poynters agreed to a settlement of the foreclosure action. (*Id*.) As part of the settlement, the parties entered into a loan modification agreement. (*Id*.) The modification "declared their loan current, . . . reduced the Poynters' interest rate and required monthly payments going forward." (*Id*.) The loan modification agreement contained the following provision:

> 17. <u>No Trial By Jury</u>: BY EXECUTING THIS MODIFICATION, BORROWERS IRREVOCABLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS MODIFICATION AND ANY RELATED AGREEMENTS OR DOCUMENTS OR TRANSACTIONS CONTEMPLATED IN THIS MODIFICATION.

(D.N. 38-1, PageID # 429)

The modification agreement, which was signed by Dean Poynter, Teddy Gordon, and a representative from Ocwen, also stated:

19. Notices: All notices should be sent to: . . .

> If to Borrowers:
> Dean A. Poynter
> Lois M. Poynter
> [redacted]
> Louisville, Kentucky 40272

(D.N. 38-2, PageID # 441–42) Additionally, the parties agreed that that the terms of the modification agreement could only be changed by written consent of both the Poynters and Ocwen. (*Id.*, PageID # 440) A Home Affordable Modification Program (HAMP) cover sheet was used as the cover sheet for the loan modification agreement. (D.N. 56-1, PageID # 1072)

The Obama Administration created HAMP in 2008 to help struggling homeowners by incentivizing loan investors and servicers to enter into mortgage modification agreements. Jean Braucher, *Humpty Dumpty and the Foreclosure Crisis: Lessons from the Lackluster First Year of the Home Affordable Modification Program (HAMP)*, 52 Ariz. L. Rev. 727, 729 (2010). The HAMP program set forth detailed guidelines for borrower eligibility and required borrowers to submit specific documentation to the United States Treasury to qualify for the program. (D.N. 56-1, PageID # 1072) *See also* Braucher, 52 Ariz. L. Rev. at 729. Ocwen maintains that it did not submit the Poynters' modification as a HAMP modification to the U.S. Treasury. (D.N. 56-1, PageID # 1072)

Rather than making payments on the loan themselves, the Poynters arranged for Gordon to make the payments for them. (D.N. 59, PageID # 1234) According to the Poynters, Ocwen "failed to apply payments made by the Poynters" and "assessed and attempted to collect from the Poynters['] fees and charges not owed." (D.N. 26, PageID # 277) On April 17, 2012, and again in January 2013 and February 2013, Gordon wrote Ocwen to inform it that the Poynters were

represented by him and requested that all future correspondence be directed to him, and not the Poynters. (*Id.*, PageID # 284) On March 15, 2013, Ocwen wrote Lois Poynter:

> Concern: We are in the receipt a correspondence [sic] from Teddy B. Gordon (Attorney at Law), who expressed concern regarding the late charge and lender placed insurance assessed on the above loan. We were requested to respond to the quires [sic] outlined in the correspondence.

> Response: Our records indicate that Teddy B. Gordon (Attorney at Law) is not authorized to receive any information on the above-referenced loan number. Please note that in order for us to authorize Teddy B. Gordon (Attorney at Law), it is requested that you provide us with a written authorization.

(D.N. 26-3, PageID # 311) The Poynters never submitted written authorization for Gordon to receive future correspondence. (D.N. 59, PageID # 1234) As a result, Ocwen continued to send notices to the Poynters' home address. (*Id.*)

In July 2013, the Poynters, represented by Teddy Gordon, filed the instant action in Jefferson County, Kentucky Circuit Court. (D.N. 1, PageID # 1) Ocwen removed the case to federal court. (*Id.*) In the Poynters' amended complaint, they claim violations of § 1692c of the FDCPA, the Kentucky Consumer Protection Act, and the Real Estate Settlement Procedures Act. They also seek class action certification for these claims. (D.N. 26) The Poynters allege that Ocwen improperly communicated with them as well as other consumers when Ocwen had actual knowledge that these consumers were represented by counsel. (*Id.*, PageID # 285–86) In addition to their class action claims, the Poynters allege breach of contract; unjust enrichment; violations of the FDCPA, Kentucky Consumer Protection Act, and Truth in Lending Act (TILA); fraud; intentional infliction of emotional distress; defamation; and invasion of privacy in their individual capacities. (D.N. 26)

Ocwen Loan and Wells Fargo filed a joint motion to dismiss. (D.N. 44) This Court granted the motion to dismiss in part, leaving four claims: (1) FDCPA (class action); (2) breach of contract; (3) FDCPA (individual); and (4) TILA violation. (D.N. 68)

On September 10, 2015, Ocwen and Wells Fargo filed a joint motion to strike the plaintiffs' jury demand. (D.N. 38) Three months later, the Poynters filed a motion for class certification. (D.N. 58) The Court determined that a hearing on both motions would be helpful. (D.N. 68) A hearing was held November 21, 2016. (D.N. 74)

## II.    DISCUSSION

### A.

As grounds for their motion to strike, Ocwen and Wells Fargo argue that the loan modification agreement contained a jury waiver provision that should be enforced. (D.N. 38-1, PageID # 429) In response to the defendants' motion, the Poynters argue that the loan modification here was a HAMP modification and a HAMP modification cannot contain such waivers. (D.N. 50, PageID # 566–70)

The Poynters also claim that they did not knowingly and voluntarily waive their right to a jury trial. (*Id.*, PageID # 570–71) Third, the Poynters assert that the waiver is unenforceable because the defendants breached the contract first and thus cannot selectively enforce the jury waiver. (*Id.*, PageID # 571–73) Finally, the Poynters argue that the jury waiver does not apply to its class action FDCPA claim because the claim does not rely on the modification agreement. (*Id.*, PageID # 573–74)

The defendants respond that the loan modification agreement was not a HAMP modification because it "was processed and administered internally" and was never submitted as a HAMP modification. (D.N. 56, PageID # 1061–63) The defendants maintain that the HAMP

cover sheet was used purely as a matter of convenience.  (D.N. 75, PageID # 1614–17)  Next, the

defendants argue that the Poynters are precluded from claiming that they did not knowingly and

voluntarily agree or consent to the jury waiver because they signed the loan modification

agreement and were represented by counsel throughout the process.  (D.N. 56, PageID # 1063–

64)  Finally, the defendants assert that the waiver provision is enforceable.  (*Id*., PageID # 1064–

66)

**B.**

The right to a jury trial can be contractually waived provided the waiver is knowing and

voluntary.  *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 757–58 (6th Cir. 1985).  "When a

contract contains an express jury waiver provision, the party objecting to that provision has the

burden of demonstrating that its consent to the waiver was not knowing and voluntary."  *Integra*

*Bank Nat'l Ass'n v. Rice*, No. 3:11-CV-49, 2011 WL 2437789, at *5 (W.D. Ky. June 14, 2011)

(quoting *Efficient Sols., Inc. v. Meiners' Country Mart, Inc.*, 56 F. Supp. 2d 982, 983 (W.D.

Tenn. 1999)); *see also K.M.C.*, 757 F.2d at 757–58.  To determine whether a jury trial waiver is

knowing and voluntary, courts have looked to the following factors:

> (1) the conspicuousness of the waiver provision, (2) the level of sophistication
> and experience of the parties entering into the contract, (3) whether there was an
> opportunity to negotiate the terms of the contract, (4) the relative bargaining
> power of the parties, and (5) whether the waiving party was represented by an
> attorney.

*Deleplancque v. Nationstar Mortg., LLC*, No. 6:15-CV-1401-ORL-40KRS, 2016 WL 406788, at

*3 (M.D. Fla. Jan. 14, 2016) (citing *Allyn v. W. United Life Assurance Co.*, 347 F.Supp.2d 1246,

1252 (M.D. Fla. 2004)).

Similar to the waiver in *Integra Bank*, the waiver here was conspicuous because it was

distinguished by all capital letters, it was "contained in its own paragraph," and the paragraph

heading was underlined. (D.N. 38-1, PageID # 429) 2011 WL 2437789, at *5. While the sophistication level of the Poynters is unclear, the waiver did not require any special education or experience to be understood. *See Deleplancque*, 2016 WL 406788, at *3; *Wells Fargo Bank, N.A. v. Osprey Commerce Ctr., LLC*, No. 8:13-CV-1738-T-27MAP, 2014 WL 1271460, at *2 (M.D. Fla. Mar. 26, 2014). And, the Poynters were represented by counsel throughout the modification process. (D.N. 56, PageID # 1063 (citing D.N. 38-2, PageID # 443–44); D.N. 75, PageID # 1619) During this process, the Poynters had an opportunity to negotiate the terms of the modification through their attorney. (D.N. 56, PageID # 1063 (citing D.N. 38-2, PageID # 443–44); D.N. 75, PageID # 1619) While Wells Fargo and Ocwen arguably had more bargaining power because of their resources as large financial organizations and leverage to initiate a foreclosure, this advantage was largely negated by the Poynters' use of an attorney. *See First Tenn. Bank Nat'l Ass'n v. Deuce McAllister Motors, LLC*, No. 09-2395, 2010 WL 11493679, at *4 (W.D. Tenn. Apr. 27, 2010). Based on these factors, the Court concludes that the Poynters' jury waiver was knowing and voluntary.

The Poynters also argue that the waiver should not be enforced because the contract was a HAMP modification, and HAMP modifications cannot contain such waivers. ((D.N. 50, PageID # 566–68) As evidence that this was a HAMP modification, the Poynters point to the HAMP cover sheet that was used for the modification agreement. (*Id.*)

As noted above, Ocwen maintains that this agreement was not a HAMP modification and that a HAMP cover sheet was used purely as a matter of convenience. (D.N. 75, PageID # 1629–30) Ocwen emphasizes that the agreement itself contains no mention of HAMP and that a senior loan analyst at Ocwen declared that the modification agreement "was not reported to Wells Fargo as a HAMP modification, and no compensation was sought by Ocwen Loan Servicing

from the U.S. Treasury Department under HAMP." (D.N. 56-1, PageID # 1072)  The analyst added that "a borrower cannot be approved for a HAMP modification without completing and submitting a specific package of information, including specific income and asset documentation, and then qualifying under HAMP guidelines. *See* 12 U.S.C. § 5219a. None of that occurred with respect to this Modification Agreement." (*Id.*)

The Court concludes that this was not a HAMP modification.  HAMP sets forth a number of eligibility requirements and regulations that must be followed to receive a HAMP modification. *See Patrick v. CitiMortgage, Inc.*, No. 16-3436, 2017 WL 318788, at *1 n.1 (6th Cir. Jan. 23, 2017).  While having a cover letter that referred to HAMP was undoubtedly confusing, the loan modification would not be considered a HAMP modification unless all of the necessary procedures were followed.  *See* 12 U.S.C. § 5219a.  Ocwen has stated that this agreement was never submitted as a HAMP modification, and there is no evidence that it was negotiated to be a HAMP agreement. (D.N. 75, PageID # 1629–30)  Neither the agreement itself nor the emails between the parties during the negotiation process contain any mention of HAMP. (*Id.*, PageID # 1619–20)  Further, counsel for the Poynters admits that HAMP was not discussed during the negotiation process. (*Id.*, PageID # 1619–20)  Aside from the cover sheet, the plaintiffs offer no other evidence that their loan was a HAMP loan.

Instead, during the November 21, 2016 hearing, Gordon stated that he intentionally avoided mentioning HAMP during the negotiation process because he knew that a HAMP modification could not contain a jury waiver and he intended to hold the contradiction against the defendants "if it ever came to pass." (*Id.*, PageID # 1620)  Even assuming that is true, the modification contained a merger clause, which stated, "This Modification and the accompanying Settlement and Release Agreement constitutes the entire agreement between Borrowers, Ocwen

and/or Ocwen's predecessors in interest, and neither parol evidence nor any prior or other agreement shall be permitted to contradict or vary its terms." (D.N. 38-2, PageID # 440) Because the agreement itself did not mention HAMP and it was not submitted as a HAMP modification, neither the cover sheet nor parol evidence may contradict the modification and turn a non-HAMP modification into a HAMP modification.

The Poynters next argue that the waiver should be unenforceable because the defendants breached the modification agreement first, and thus they "cannot complain if the other party thereafter refuses to perform." (D.N. 50, PageID # 572) However, as the defendants point out, this theory proves too much. (D.N. 56, PageID # 1064–65) In a dispute over the enforceability of a forum selection clause, the Eleventh Circuit explained that under the Poynters' theory, "the mere pleading of the affirmative defense of 'first breach' would render every forum selection clause unenforceable." *Cornett v. Carrithers*, 465 F. App'x 841, 844 (11th Cir. 2012). The theory would similarly render any jury trial waiver unenforceable if it was accompanied by a breach of contract claim. In other words,

> If such clauses were enforceable only when no party alleges breach, they would be meaningless. In any case in which a breach is alleged, the party seeking to enforce a limitation of remedies or waiver of claims would first have to go through an entire trial to establish innocence of breach, so as to be able to use the limitation or waiver clause. At that point, of course, the clause itself becomes irrelevant, since the defendant has not breached the contract.

*Indiana Ins. Co. v. Erhlich*, 880 F. Supp. 513, 518 (W.D. Mich. 1994).

Alternatively, the Poynters assert that even if the jury trial waiver is enforceable, it applies only to their breach-of-contract claim (Count Four). (D.N. 50, PageID # 573–74) The Poynters argue that their three remaining claims (Counts One, Six, and Twelve) fall outside the scope of the jury trial waiver. (*Id*.) The jury trial waiver in the modification agreement stated that it applied to "any action, proceeding or counterclaim arising out of or relating to this

modification." (D.N. 38-2, PageID # 440)  As the Poynters note, the Sixth Circuit has held that a claim would be outside the scope of such a waiver if the Court "can resolve the instant case without reference to the agreement containing the [waiver]." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 814 (6th Cir. 2008) (citing *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 505 (6th Cir. 2007)).

The Poynters contend that Counts One, Six, and Twelve can be "established without referencing the Modification Agreement at all." (D.N. 50, PageID # 574)  Count One alleges that Ocwen Loan violated the Fair Debt Collection Practices Act when it continued to contact the Poynters after it had "'actual knowledge' that the Poynters were represented by counsel with respect to the debt Ocwen Loan serviced." (D.N. 68, PageID # 1420)  The Poynters also seek class action certification for this Count.  (D.N. 58)  Count Six "claims that Ocwen Loan violated § 1692e and 1692f [of the FDCPA] by making false or deceptive representations to the Poynters about their home loan debt and trying to collect unauthorized fees and charges on that debt." (D.N. 68, PageID # 1420)  Count Twelve alleges that Ocwen violated the TILA "by failing to credit payments made by the Poynters to their loan account as of the date of receipt." (D.N. 26, PageID # 298; D.N. 69, PageID # 1433–34)

With respect to Count One, the Poynters contend that Ocwen improperly contacted them after their attorney wrote to Ocwen advising it to send notices to him rather than the Poynters. (D.N. 26, PageID # 283–86)  Ocwen claims it then sent a third-party authorization form to the Poynters because the demand was inconsistent with the modification agreement and it needed the Poynters' written permission to change the terms of the modification. (*Id.*)  Therefore, the Court must reference the modification agreement to resolve this claim, and thus it is within the scope of the jury trial waiver. *See NCR Corp.*, 512 F.3d at 814.

As for Count Six, the Poynters allege that Ocwen made false representations, including regarding "the character and amount of money owed under the note and mortgage." (D.N. 26, PageID # 294) Because the modification agreement sets forth details about how much the Poynters would pay and when the payments were due, the Court must refer to the agreement to resolve this claim, making the claim subject to the jury trial waiver. (D.N. 38-2, PageID # 436–37)

Finally, for Count Twelve, the Poynters contend that since they "have consistently made payments in accordance with the terms of the Note, Mortgage and Modification Agreement, and the Defendant Ocwen's records suggest that payments have not been made in a timely manner, it follows that Ocwen failed to credit payments made by the Poynters as of the date of receipt," in violation of the TILA. (D.N. 69, PageID # 1433–34) Because the Poynters explicitly mention the modification agreement in their claim and take issue with Ocwen's handling of payments made pursuant to the agreement, the Court must reference the agreement in resolving the claim. As a result, this claim is subject to the jury trial waiver.

In sum, the Court concludes that the jury trial waiver is enforceable and will therefore grant the defendants' motion to strike the Poynters' jury demand. (D.N. 38)

## C.

The Poynters have filed a motion to certify the following amended class pursuant to Rule 23:

> All persons who, without consenting prior, directly received the substantial equivalent of any of the following: (1) account statement, (2) mortgage account statement, (3) notice of delinquency, (4) notice of default and/or (5) any telephone communication demanding payment from the Defendant Ocwen, a debt collector as defined by the FDCPA, despite the fact that Ocwen had actual knowledge that the class members were represented by an attorney(s) with regard to the subject debt and further Ocwen had knowledge of, or could readily ascertain, such

attorney(s) name(s) and address(es), and the attorney(s) did not fail to respond within a reasonable period of time to the communication from Ocwen, within the applicable statutory limitations period, including the period following the filing date of this action.

(D.N. 60, PageID # 1369)  Fed. R. Civ. P. 23.

Rule 23 provides the following requirements for class certification:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

  (1) the class is so numerous that joinder of all members is impracticable;

  (2) there are questions of law or fact common to the class;

  (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

  (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  The Supreme Court has explained that "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Rather, "a party seeking class certification must affirmatively demonstrate his compliance with the Rule."  *Id.*  A "district court maintains substantial discretion in determining whether to certify a class, as it possesses the inherent power to manage and control its own pending litigation."  *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 643 (6th Cir. 2006).

The Poynters assert that they have met each of Rule 23's requirements.  (D.N. 58-1, PageID # 1093)  With respect to numerosity, the Poynters contend that Ocwen had a policy of sending "third party authorizations" to delinquent mortgagees that it knew were represented by counsel and thus a percentage of these mortgagees are eligible to join the proposed class.  (*Id.*, PageID # 1096)  The Poynters state that "at least 450,871 mortgages were delinquent when Ocwen acquired the rights to service them!"  (*Id.*, PageID # 1095)  While they admit that they do

not have the data on what percentage of these mortgagees were represented by counsel, the Poynters rely on back-of-the-envelope calculations based on information released by the New York State Court System to argue that the proposed class satisfies the numerosity requirement. (*Id*., PageID # 1098–99)

As to commonality, the Poynters argue that there are a number of common questions, including "Ocwen's communications with the represented class members, whether or not Ocwen['s] behavior was pursuant to a uniform policy and procedure, Ocwen's knowledge of the class members' representation, and Ocwen's Federal statutory duties relating to its misconduct." (*Id*., PageID # 1101)

Third, the Poynters claim that they are typical of all class members because, like these members, they received improper communications pursuant to Ocwen's policy of "tendering 'third-party authorizations' to class members directly after it had actual knowledge that they were represented by counsel" and then communicating directly with members, instead of with counsel. (*Id*., PageID # 1096, 1104)

Finally, the Poynters state that they "and their counsel will fairly and adequately protect the interests of the class" because they have common interests with the class members and will "vigorously prosecute the interest of the class through qualified counsel." (*Id*., PageID # 1105 (citing *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013)).

Ocwen responds that the Poynters' claims are unique because the terms of the loan modification agreement that resulted from the earlier litigation are what caused Ocwen to send the third-party authorization form, verifying that the Poynters authorized attorney Teddy Gordon to receive their notices. (D.N. 59, PageID # 1237–41) Furthermore, Ocwen maintains that it did not have a general policy of improperly contacting borrowers who were represented by counsel.

(*Id.*)  According to Ocwen, the third-party authorization form that was sent to the Poynters was created to comply with 15 U.S.C. § 1692c(b), which provides, in relevant part, that

> without the prior consent of the consumer given directly to the debt collector, . . . a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

15 U.S.C. § 1692c(b).  Ocwen states that it adapted its third-party authorization form to the Poynters' unique situation when Gordon informed Ocwen that the Poynters' notices should be sent to him.  (D.N. 59, PageID # 1249–50)

Additionally, Ocwen asserts that the Poynters rely on assumptions and conclusory allegations, but have not produced "any evidence concerning even one other member of the proposed FDCPA class."  (*Id.*, PageID # 1248)  Because the Poynters' situation is unique, Ocwen argues, they have failed to demonstrate numerosity, commonality, or typicality.  (*See* D.N. 59)  Finally, Ocwen claims that the Poynters and their counsel are not adequate representatives because Gordon is not experienced in class action litigation and he is a material fact witness in the case.  (*Id.*, PageID # 1245)

### 1.  Numerosity

With respect to the first requirement, "[t]here is no automatic cut-off point at which the number of plaintiffs makes joinder impractical, thereby making a class-action suit the only viable alternative."  *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004) (citing *In re Am. Med. Sys. Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)).  Rather, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."  *Gen. Tel. Co. of the Nw. v. Equal Emp't Opportunity Comm'n*, 446 U.S. 318, 330 (1980).  The Sixth Circuit has explained that "[w]hen class size reaches substantial proportions . . . the

impracticability requirement is usually satisfied by the numbers alone." *Turnage v. Norfolk S. Corp.*, 307 F. App'x 918, 921 (6th Cir. 2009) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1079). "Nonetheless, 'impracticability of joinder must be positively shown, and cannot be speculative.'" *Id.* (quoting *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005)).

In *Turnage*, the district court denied class certification for a private nuisance action brought against a railroad that derailed and spilled chemicals, holding that the plaintiffs had not met their burden of establishing numerosity. *Id.* The plaintiffs in *Turnage* sought class certification for people who had yet to be compensated for the spill, and one of the plaintiffs estimated the size of this class by comparing the total number of households in the affected area to the number of households that the defendant said it had compensated. *Id.* In affirming the district court's holding, the Sixth Circuit relied on the Fifth Circuit's "helpful analysis of a situation where a would-be class representative states a large number, but that number includes individuals within the proposed class mixed together indiscriminately with others not within the proposed class." *Id.* at 922 (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030 (5th Cir. 1981)). The Sixth Circuit explained:

> *Zeidman* involved a suit by investors who alleged that several companies issued false information in order to depress the value of certain securities during a pending tender offer. *Id.* at 1033. In order to establish numerosity, the plaintiffs asserted that nearly six million shares were sold during the relevant dates. *Id.* at 1034. The Fifth Circuit noted the reasonableness of the plaintiffs' assumption that "any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be so numerous that joinder of all members is impracticable," and the court commented that such numbers normally would establish numerosity. *Id.* at 1039 (internal quotation marks omitted). Yet that court found the class size in that case to be speculative. First, the court noted that certain categories of investors were excluded from the class, meaning the plaintiffs' aggregate numbers necessarily referred to a group that was larger than the group they purported to represent. *Id.* at 1040. Second, the court noted that the trial court gave the plaintiffs a chance to submit additional evidence prior to

rendering a final decision. *Id.* Given these facts, the appellate court determined
that the trial court had not abused its discretion by refusing to certify a class.

*Id.*

Based on this reasoning, the Sixth Circuit concluded that because the plaintiff in *Turnage*
did not provide evidence about how many of the households that had not been compensated had
actually been injured and deserved compensation, numerosity was too speculative. *Id.* The
Sixth Circuit explained, "[t]he plaintiff in the instant case cites large numbers, but his numbers
include not just the members of his proposed class but every resident of the three-mile radius.
Without 'some evidence of the size either of the excluded group or of the remaining
class,' . . . evidence of numerosity remains speculative." *Id.* (quoting *Zeidman*, 651 F.2d at
1040)

The Poynters calculate that Ocwen acquired "at least 450,871" delinquent mortgages that
were subject to the FDCPA. (D.N. 58-1, PageID # 1095–96) The Poynters explain that "[t]he
final factor in the equation is what percentage of the near or greater than 450,871 consumers
were represented by counsel and were subsequently contacted directly by Ocwen. While data on
that factor is scarce the sheer scale of Ocwen's mortgage servicing portfolio compels the
conclusion that the number is indeed staggering." (*Id.*, PageID # 1098) The Poynters then use
data from New York State to assert that if even 10 percent of Ocwen's mortgagees in New York
who were represented by counsel were improperly contacted by Ocwen, that alone would be
sufficient to satisfy the numerosity requirement of Rule 23. (*Id.*, PageID # 1099)

Whether the Poynters satisfy the numerosity requirement is a close call. Based on the
Poynters' calculations, if even a small percentage of Ocwen's mortgagees were improperly
contacted by Ocwen, numerosity would be satisfied because the number of potential class
members would be substantial enough that joinder would be impracticable. *See Turnage*, 307 F.

App'x at 921.  However, as in *Turnage* and *Zeidman*, the Poynters cite large numbers but fail to provide "evidence of the size either of the excluded group or of the remaining class."  *Turnage*, 307 F. App'x at 921 (quoting *Zeidman*, 651 F.2d at 1040).  The Poynters had the opportunity to conduct discovery, but have presented no evidence that any other mortgagees were improperly contacted by Ocwen despite being represented by counsel. (D.N. 59, PageID # 1247–48 (citing D.N. 58-1, PageID # 1112); D.N. 75, PageID # 1641)  Therefore, the Poynters' analysis is merely speculative and they have not demonstrated that "the class is so numerous that joinder of all members is impracticable."  Fed R. Civ. P. 23; *see Turnage*, 307 F. App'x at 921.

### 2. Commonality

Rule 23 requires the plaintiff to demonstrate that "there are questions of law or fact common to the class."  *Id*.  However, "[t]hat language is easy to misread, since any competently crafted class complaint literally raises common 'questions.'"  *Dukes*, 564 U.S. at 349 (internal quotation marks and alterations omitted) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–132 (2009)).  The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*.  In other words, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Id*. (quoting Nagareda, 84 N.Y.U. L. Rev. 97, at 132).

The Poynters state that "there are a number of common questions of law and fact" in this case, including "Ocwen's communications with the represented class members, whether or not

Ocwen['s] behavior was pursuant to a uniform policy and procedure, Ocwen's knowledge of the class members' representation, and Ocwen's Federal statutory duties relating to its misconduct." (D.N. 58-1, PageID # 1101)  The Poynters claim that any one of these common questions is sufficient to satisfy Rule 23's commonality requirement.  (*Id.*)

Ocwen argues that the Poynters are unique because their loan modification agreement required that notices be sent to directly to the Poynters and any changes to that provision had to be authorized by the Poynters in writing.  (D.N. 75, PageID # 1640)  Additionally, Ocwen asserts that § 1692c has subjective criteria that would have to be evaluated on a case-by-case basis, making class certification inappropriate.  (*Id.*, PageID # 1638)  For example, Ocwen states that determining whether it was a debt collector at the time of communication and whether the borrower was represented by counsel at the time would need to be individually analyzed for each class member.  (*Id.*)

Ocwen also maintains that its third-party authorization form was created to comply with § 1692c(b) to deal with communications with third parties, such as real estate agents, and was adapted to this unique situation involving Teddy Gordon.  (*Id.*, PageID # 1639)  For support, Ocwen points out that the document was not "designed to be used for attorneys" and that there is nothing on its face that mentions attorneys.  (*Id.*, PageID # 1640)  Ocwen further emphasizes that the Poynters have produced no evidence that this document was used in any other "attorney situations."  (*Id.*, PageID # 1641)

In response, the Poynters contend that they are not unique because the authorization letter that Ocwen sent to them was a form letter and did not reference the modification.  (*Id.*, PageID # 1634)  The Poynters also argue that Ocwen should have been familiar with attorney Teddy

Gordon because he represented the Poynters during their previous litigation with Ocwen, making the authorization form even more unnecessary. (*Id.*, PageID # 1644)

The Court concludes that the Poynters have not satisfied the commonality requirement. First, the Poynters have not demonstrated that Ocwen had a policy of improperly communicating with borrowers it knew were represented by counsel. The Poynters claim that Ocwen "admitted" that it had such a policy based on the following language in Ocwen's response to their motion to amend:

> particularly in this age where consumer personally identifying information is being chronically stolen . . . **the prudent method of approaching the matter** was to ascertain the accuracy of the information **by means of seeking, from the borrowers, a third party authorization** permitting disclosure of their information. As a result of **exercising a precautionary duty**, Ocwen apprised the Poynters that **Attorney Gordon was not authorized to receive information** on their loan; and, **that it would require a third-party authorization from the Poynters**.

> . . . The fact that Ocwen has a "standardized **form**" for third-party authorization **merely acknowledges its compliance with the directives of [the FDCPA]**.

(D.N. 58-1, PageID # 1096–97) However, the language omitted between the two paragraphs reads:

> Moreover, the allegation that the particular facts underlying the Poynters' case amounts to a "standardized policy and/or procedure" employed by Ocwen **is wholly unwarranted**. As discussed, *supra,* the Poynters' account has a history with respect to origination, servicing, transfer of interest, modification, and legal proceedings. **Simply stated, this matter stands as an exception to the norm, as opposed to a routine account**. Further, the supposition that the facts here demonstrate a "standardized policy and/or procedure" **is unsupported by any written evidence of same**. The fact that Ocwen has a "standardized form" for third-party authorization merely acknowledges its compliance with the directives of 15 U.S.C. § 1692c. **As such, Ocwen objects to this FDCPA claim in its entirety, either standing alone or as a class action**. This count will not survive a motion to dismiss and the proposed amendment is therefore futile.

(D.N. 59, PageID # 1230) Ocwen has repeatedly explained that the third-party authorization form that was sent to the Poynters was created to comply with § 1692c(b) and was adapted to the

Poynters' unique situation. (*Id.*, PageID # 1230–31; D.N. 75, PageID # 1639–41) The Poynters make only conclusory allegations that Ocwen improperly contacted borrowers it knew were represented by counsel and provide no evidence that anyone else was sent such an authorization form. (D.N. 59, PageID # 1248) Further, Ocwen's defense largely revolves around the terms of the loan modification, which applies only to the Poynters. (*Id.*, PageID # 1242–43)

Additionally, as Ocwen points out, each class member would require individual analysis to determine whether the person was a "consumer" under the FDCPA and whether Ocwen was a "debt collector" at the time of collection, in addition to other critical details regarding the communications among the consumer, the consumer's counsel, and Ocwen. (*Id.*, PageID # 1253) This case-by-case analysis is likely "to impede the generation of common answers." *Dukes*, 564 U.S. at 349 (quoting Nagareda, 84 N.Y.U. L. Rev. 97, at 132).

Therefore, the Poynters have not met their burden of showing that there is a common question of law or fact. *See* Fed. R. Civ. P. 23.

### 3. Typicality

"In order to meet the typicality requirement, the plaintiffs must show that their 'injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff.'" *Bacon*, 370 F.3d at 572 (quoting *In re Am. Med.*, 75 F.3d at 1082). "Rule 23(a)(3) typicality 'determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.'" *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998)). The Sixth Circuit "has summarized this standard: '[a]s goes the claim of the named plaintiff, so go the claims of the class.'" *Id.* (quoting *Sprague*, 133 F.3d at 399).

As with commonality, the Poynters argue that Ocwen had a policy of improperly contacting consumers it knew were represented by counsel.  (D.N. 58-1, PageID # 1103)  The Poynters claim that they are typical of the class because they received notices from Ocwen despite Gordon informing Ocwen that notices were to be sent to him rather than the Poynters.  (*Id.*, PageID # 1103–05)  Ocwen maintains that the Poynters are unique because the loan modification agreement that resulted from earlier litigation required it to send notices directly to the Poynters and specified that any changes to this requirement must be made in writing by the Poynters.  (D.N. 59, PageID # 1238–40)

Again, the Poynters rely on conclusory allegations that Ocwen had a policy of improper communications but provide no evidence that anyone other than the Poynters was contacted directly when Ocwen knew they were represented by counsel.  (*Id.*, PageID # 1248))  Even assuming Ocwen did have such a policy, the Poynters would still be unique because their loan modification agreement specifically stated that all notices were to be sent directly to them and any change was to be made by the Poynters in writing, and these facts are key to Ocwen's defense.  (*Id.*, PageID # 1242–43)  Because Ocwen maintains that it adapted its third-party authorization form to the Poynters' unique situation and the Poynters have not provided any evidence that anyone else was sent this adapted authorization form, the Poynters have not demonstrated that their injuries are typical of the proposed class.  *See Bacon*, 370 F.3d at 572 (quoting *In re Am. Med.*, 75 F.3d at 1082).

### 4.  Class Interests

The Sixth Circuit has articulated the following analysis for determining whether "the representative parties will fairly and adequately protect the interests of the class":

We use a two-prong test . . . : 1) [T]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives

will vigorously prosecute the interests of the class through qualified counsel.  In addition, we review[ ] the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and to consider whether the class members have interests that are not antagonistic to one another. Finally, [o]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate.

*Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013) (internal quotation marks and citations omitted).

The Poynters argue that they satisfy both prongs of the two-part test because (1) their mortgages "are all subject to the protections of the FDCPA" and each has sustained the same injury from Ocwen and seeks the same relief as class members; and (2) they "have expended significant time and effort in prosecuting this case."  (D.N. 58-1, PageID # 1106–07)  Additionally, the Poynters assert that their "counsel have extensive experience in prosecuting complex litigation such as this one" and "are ready, willing and able to devote as much financial resources and additional manpower as become necessary."  (*Id.*)

Ocwen responds that the Poynters and their counsel are inadequate representatives because, for the reasons discussed above, the Poynters do not have the same claims and injuries as the proposed class.  (D.N. 59, PageID # 1244–45)  Ocwen also contends that Teddy Gordon and his firm have provided no evidence that they have experience handling class actions. Finally, Ocwen asserts that Gordon and his firm are material fact witnesses because they were involved in negotiating the Poynters' loan modification agreement and thus cannot adequately represent the class.  (*Id.*, PageID # 1246–47)  Ocwen states that "Mr. Gordon and his firm are essentially the only ones who can testify as to what payments were and were not made to Ocwen on the Poynters' loan during the relevant time period."  (*Id.*)

The Court concludes that the Poynters and their counsel cannot fairly and adequately represent the interests of the proposed class. While the Court does not doubt that counsel would vigorously prosecute the class's interests, as discussed above, the Poynters' claims are distinguishable from the claims of the proposed class because of the loan modification agreement. (*Id*., PageID # 1230–31; D.N. 75, PageID # 1639–41) Thus, the Poynters are not representative of the class and cannot satisfy the Sixth Circuit's two-prong test. *Vassalle*, 708 F.3d at 757 (citing *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083).

Additionally, the Court shares Ocwen's concern about Mr. Gordon and members of his firm becoming material fact witnesses. (D.N. 59, PageID # 1245–46) "Where there is a substantial possibility that the class counsel will be called as a witness to the transaction in which he or she represented the named plaintiffs, and might therefore be disqualified from serving as counsel, the named plaintiffs are not adequate representatives of the class." John Bordeau, et al., 32B Am. Jur. 2d Federal Courts § 1669 (2017) (citing *Shroder v. Suburban Coastal Corp*., 729 F.2d 1371 (11th Cir. 1984)). "The test is whether the attorney is an obvious and objectively necessary witness, and if so, he or she is not an appropriate choice for class counsel and cannot give adequate representation." *Id*. (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 119 F.R.D. 344 (S.D.N.Y. 1988), *judgment aff'd*, 903 F.2d 176 (2d Cir. 1990)). "Counsel could not continue to serve if the testimony would concern either the material facts of the case or facts that could not be elicited from other witnesses." *Id*. (citing *Clark v. Cameron-Brown Co.*, 72 F.R.D. 48 (M.D.N.C. 1976)).

While Gordon and his firm argue that there is no conflict because they are not "necessary" witnesses, the Court is doubtful. (D.N. 60, PageID # 1379) During the November 21, 2016 hearing, Gordon admitted that he represented the Poynters in their previous litigation

that resulted in the loan modification agreement and was called upon to explain his understanding of the agreement. (D.N. 75, PageID # 1619–20) Because Ocwen relies heavily on the loan modification agreement in its defense, it appears likely that Gordon will be called upon as a material fact witness to answer questions regarding his communications with Ocwen, the Poynters' understanding of the agreement, and the Poynters' payments. (D.N. 59, PageID # 1245–46)

Because it is likely that Teddy Gordon and his firm will be necessary material witnesses, the Poynters and their counsel could not provide fair and adequate representation of the proposed class. *See* Ky. R. Prof'l Conduct 3.130(3.7); Bordeau, 32B Am. Jur. 2d Federal Courts § 1669.

## III.   CONCLUSION

For the reasons explained above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)   The defendant's motion to strike the plaintiffs' jury demand (D.N. 38) is **GRANTED**. The Clerk of Court is **DIRECTED** to strike the jury demand from Plaintiffs' complaint.

(2)   The plaintiffs' motion to certify a class (D.N. 58) is **DENIED**.

June 27, 2017

**David J. Hale, Judge**
**United States District Court**